UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 08-10025-GAO

UNITED STATES OF AMERICA

v.

KHAREE CRISWELL,
Defendant.

OPINION AND ORDER
October 15, 2009

O'TOOLE, D.J.,

The defendant, Kharee Criswell, is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He was a passenger in a motor vehicle that was stopped by police, and now moves to suppress the firearm found in that car, as well as inculpatory statements he made thereafter. He claims that the stop of the car was not based on reasonable suspicion, and that police unconstitutionally prolonged the stop when they inquired about his identity. After an evidentiary hearing and consideration of the arguments of the parties, I conclude that the motion ought to be denied for the reasons explained below.

**I.   Facts**

I find the following facts:

In the early morning of January 11, 2008, Criswell was the front seat passenger in a red Pontiac traveling on Dudley Street in Roxbury, Massachusetts. The car was driven by his girlfriend at the time, Teneer Brown. Another passenger, James Murray, was in a back seat.

Officer Brian Dunford of the Boston Police Department was driving alone in a marked police cruiser on Dudley Street approaching Hampden Street when he observed the red Pontiac

proceeding in the opposite direction with one headlight "almost fully extinguished." (Tr. of Evidentiary Hr'g 9:24 [hereinafter Tr.].) After the cars passed each other, Dunford made a U-turn and followed the Pontiac in order to initiate a traffic stop based on his observation of the malfunctioning headlight. Pictures of the vehicle taken shortly after the stop show that the car's left front headlight was indeed malfunctioning, and Criswell's counsel's attempt to quarrel about whether an adjacent auxiliary light that was working was a "headlight" was, as Nero Wolfe would put it, flummery.

Criswell testified that the police car that stopped the Pontiac had come from a different direction and the officer could not have seen the front headlights. I am not persuaded by this testimony. Before the stop, it is doubtful that Criswell was paying close attention to the movements of other cars, including police vehicles. He was not driving, and there was no reason for him to be especially attentive to other traffic. He acknowledged that he was sometimes looking out the right side of the car as it drove. In addition, there was a police station not far away, and it is very possible Criswell saw a police car at one point and then after the stop assumed it was that car that had stopped the Pontiac. Moreover, the fact that the headlight was clearly malfunctioning supports Dunford's version of the events leading up to the stop. Criswell's version—that Dunford stopped the car without observing any traffic violation, but by his good fortune happened to find that the car had a broken headlight—would be plausible, but much less likely.

After Dunford activated his cruiser's lights, the car turned the corner onto Warren Street and came to a complete stop. Dunford approached the driver's window and asked Brown for her license and registration. She produced a learner's permit. Dunford went to his cruiser for a short time (ten to twenty seconds, in Criswell's estimation) and returned to the car. Because a person

with a learner's permit is only authorized to drive if a passenger in the vehicle has an active driver's license, Dunford asked Criswell and Murray if they had driver's licenses. Each replied that he did not.

Dunford asked both passengers for their names. Criswell told Dunford that his name was Elijah Mustafa. Dunford asked him to spell his first name, and Criswell spelled it "E-L-I-J-H-A." Dunford asked for his birth date, and Criswell responded that it was 11/77, but could not provide a specific date when pressed.[1] Dunford believed that he had been given a false name and radioed for backup. (Id. at 33:11–15.)  Other officers arrived quickly, and Dunford told them that he believed he had been given fake names by the passengers in the Pontiac.

One of the other officers obtained Criswell's identification, which was not a driver's license. Dunford testified that one of the officers asked Criswell for it. Criswell testified, with evident annoyance, "I didn't give anybody my identification; they took my identification," and that he was standing outside the car when this occurred. (Id. at 47:9–13.) There was no evidence presented about exactly how he came to be outside the car, but both parties agree that he was asked to step out of the car at some point and he did. After Criswell stepped out of the car, one of the officers saw a firearm on the floor between the front passenger seat and the doorway. Criswell did not contest that the firearm was visible from outside the car when the passenger door was open. Criswell was placed in handcuffs and arrested after he told police that he lacked a firearms license.

At some point, Brown was arrested because of an outstanding Texas warrant, and for operating the vehicle without a license. She was also cited for operating without a license and for

---

[1] In his testimony, Criswell confirmed Dunford's testimony about the false name and how he spelled it and also acknowledged that "basically" he had given "a fake date of birth." (Id. at 46:2–3.)

having a defective headlight. Murray was apparently also arrested because of an outstanding warrant. The owner of the car—Brown's mother—later arrived and was allowed to drive the car home. Later, at the police station, Brown stated that she knew Criswell owned a gun, but did not know that he had it in the car. Criswell stated that the gun was his. While Criswell seeks to suppress his oral statements as the poisoned fruit of an unlawful detention at the scene of the traffic stop, he does not contend that the statements were involuntary or made without adequate Miranda warnings having been given.

## II.    Fourth Amendment Analysis

Although Criswell lacks standing to directly challenge the search of the car that yielded the gun, a passenger in a car that is stopped by police may challenge the constitutionality of the stop. See Brendlin v. California, 551 U.S. 249, 127 S.Ct. 2400, 2403 (2007); United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998). The Fourth Amendment's prohibition of unreasonable seizures is implicated by brief investigatory detentions, so-called Terry stops, which must be based on reasonable suspicion to be lawful. Terry v. Ohio, 392 U.S. 1, 19–20 (1968). In addition to the requirement that reasonable suspicion must be present to justify the seizure at its inception, the actions subsequently taken by police must be reasonably related in scope to the circumstances which justified the initial interference. Id.

### A.    The Initial Stop

It is the government's burden to prove that a warrantless stop of a vehicle was justified. United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). The only basis asserted by Dunford for stopping the red Pontiac in which Criswell was riding was that it had a malfunctioning headlight. It is also undisputed that this traffic violation, if actually observed by Dunford, permitted him to lawfully stop the vehicle. See Whren v. United States, 517 U.S. 806, 810

(1996); United States v. Andrade, 94 F.3d 9, 12 (1st Cir. 1996). The question is whether Dunford in fact observed this traffic violation. As noted above, after consideration of the evidence presented by the parties, I find that he did. The stop of the vehicle, and consequently the vehicle's occupants, was lawful.

      B.      The Scope and Duration of the Stop

The justification for the traffic stop is only the first part of the Fourth Amendment analysis. It is also necessary to consider "whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). The burden is on the government "to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983); see United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

The firearm was found after one of the officers asked Criswell to step out of the car. After making a lawful traffic stop, police officers may, without cause, order the driver and other occupants out of the vehicle. Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). The Mimms-Wilson rule is a "bright-line" rule. See Wilson, 519 U.S. at 413 & n.1. See also United States v. Ruidiaz, 529 F.3d 25, 32 (1st Cir. 2008) (noting that an officer may order a passenger out of a lawfully stopped car "as a matter of course" without "an *independent* fear for his safety"). Criswell's argument is essentially that he could have been ordered out of the car at an earlier point, but not after officers had unlawfully expanded the scope of the stop by asking him questions about his identity. I agree that the ability of law enforcement to order an occupant out of a stopped vehicle lasts only so long as the lawful

seizure. Once the officer has completed his investigation into the circumstances giving rise to his suspicion (both initial and emerging), officer safety—the primary justification behind the Mimms-Wilson rule—is assured simply by ending the encounter and moving along.

In this case, however, Criswell was lawfully ordered out of the vehicle. Even assuming *arguendo* that the reason for the initial stop did not justify the officers' questions directed at determining Criswell's identity, those questions did not prolong the stop. The duration of the stop was justified for reasons related to the driver, who was being written a citation for the defective headlight and for operating the vehicle without a license and also was being arrested because officers had learned that she had an outstanding warrant. Regardless of whether the officers initiated any coterminous investigation of Criswell, he was "as a practical matter . . . already stopped by virtue of the stop of the vehicle." See Wilson, 519 U.S. at 413–14. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, -- U.S. --, 129 S.Ct. 781, 788 (2009). He could therefore be ordered out of the car. See Wilson, 519 U.S. at 415.[2]

There being no constitutional violation, there is no basis for suppressing the firearm or Criswell's statements.

---

[2] This case is therefore not analogous to United States v. Henderson, 463 F.3d 27, 46 (1st Cir. 2006), where, apart from the challenged inquiry directed at a passenger, "there was no other reason to prolong the stop." Moreover, in Henderson, the passenger's person was searched incident to his arrest after the inquiry supplied the information for a computer records search that revealed (incorrectly, as it turned out) an outstanding arrest warrant. See id. at 28.

## **IV.** **Conclusion**

For the foregoing reasons, the Defendant's Motion to Suppress Fruits of Warrantless Stop and Detention and Memorandum in Support (dkt. no. 20) is DENIED.

It is SO ORDERED.

   /s/ George A. O'Toole, Jr.
United States District Judge